UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHRISTINA R. HUGHES, Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:17-CV-290 |
| | ) |
| CFA, INC., | ) |
| and | ) |
| XEROX STATE & LOCAL SOLUTIONS, | ) |
| INC., Defendants | ) |

**COMPLAINT and DEMAND FOR JURY TRIAL**

**I.    OVERVIEW OF THE CASE**

1. The State of Indiana (not a party in this matter) engaged Xerox State & Local Solutions, Inc. ("Xerox"), to administer certain aspects of Indiana's benefit programs, such as TANF (Temporary Assistance for Needy Families).  Xerox subcontracted with CFA, Inc. ("CFA")—a staffing company—to hire workers and to perform certain human-resources functions.

2. Plaintiff Christina R. Hughes ("Plaintiff") was hired as an Eligibility Specialist and began working for Xerox and CFA on or about September 17, 2014.  Plaintiff fell ill on or about January 16, 2015, and underwent surgery for a bowel obstruction, a serious intestinal condition.  Defendants discriminated against Plaintiff in her employment, declined to make reasonable accommodation, and effectively terminating her employment—all in violation of the Americans with Disabilities Act (ADA), as amended.  As a consequence of Defendants' actions, Plaintiff suffered a variety of harms.

## II. INTERPRETATION OF THIS COMPLAINT

3. Each section of this Complaint should be understood to incorporate by reference the information provided in all other sections.

## III. PARTIES

A. <u>Defendant Xerox State & Local Solutions, Inc.</u>

4. Xerox State & Local Solutions, Inc., is a corporation doing business in many jurisdictions, including the southern district of Indiana.

5. Its activities include—but are not limited to—work under contract with the State of Indiana to administer various aspects of TANF and other benefits programs.

6. Xerox had at least fifteen (15) employees at all times relevant to this matter.

7. On information and belief, Xerox has more than three hundred (300) employees.

8. Xerox was an employer of Plaintiff, within the meaning of "employer" in the ADA (as amended).

9. Xerox was, with CFA, Inc., a joint-employer of Plaintiff, exercising authority over some conditions of employment. For example, Xerox directed and supervised Plaintiff's daily work activities, maintained a dress code, and fired a couple of her co-workers for wearing leggings or Jeggings at work.

B. <u>Defendant CFA, Inc.</u>

10. CFA, Inc. (doing business as CFA Staffing), is a corporation with operations in Canada and in many states of the United States—including Indiana.

11. CFA had at least fifteen (15) employees at all times relevant to this matter.

12. On information and belief, CFA has more than three hundred (300) employees.

13. The business operations of CFA include hiring employees to work for Xerox in administering TANF benefits for the State of Indiana.

14. CFA hired Plaintiff to work for Xerox in Beech Grove (in Marion County).

15. CFA was an employer of Plaintiff, within the meaning of "employer" in the ADA (as amended).

16. CFA was, with Xerox, a joint-employer of Plaintiff, exercising authority over some conditions of employment, including as overseeing attendance.

C.   Plaintiff Christina R. Hughes

17. Christina R. Hughes ("Plaintiff"), an adult, has been a resident of Jackson County, Indiana, at all times relevant to this matter.

18. Plaintiff was an employee of Xerox, within the meaning of the ADA (as amended) and the related regulations.

19. Plaintiff was an employee of CFA, within the meaning of the ADA (as amended) and the related regulations.

20. When employed by Xerox and CFA, Plaintiff had emergency surgery for obstructed bowel (apparently caused by scar tissue).

21. The surgery did not restore Plaintiff to perfect health.  Her physician instructed her to use the bathroom without delays, to avoid potentially very serious health complications.

22. Plaintiff has a disability within the meaning of the ADA (as amended) and the related regulations.

### IV.     JURISDICTION AND VENUE

23.   This court has subject-matter jurisdiction, as violations of federal law are alleged here. More specifically, this action arises under the Americans with Disabilities Act (as amended), especially 42 U.S.C. § 12112, as implemented through 29 C.F.R. §1630.

24.   Venue in this court is proper, as the relevant events center on a workplace in Beech Grove (in Marion County), which is within the geographical jurisdiction of this court.

25.   Venue in this court is proper, as Defendants conduct business within the geographical jurisdiction of this court.

26.   Venue in this court is proper, Plaintiff resides within the geographical jurisdiction of this court.

### V.     TECHNICAL ISSUES OF FILING

A.     Administrative remedies have been exhausted in this matter.

27.   Plaintiff filed a single charge against both employers with the EEOC.  (The EEOC processed the charge under two separate charge numbers:

    470-2015-02775 for CFA, INC.

    470-2016-00171 for XEROX STATE & LOCAL SOLUTIONS, INC

28.   The EEOC attempted conciliation, but the conciliation process failed to resolve the conflict between Plaintiff and Defendants.

29.   The EEOC issued to Plaintiff a notice of right to sue with regard to each of the Defendants.  (For CFA, Inc., **Exhibit A**; for XEROX STATE & LOCAL SOLUTIONS, INC., **Exhibit B**.)

B.       This action is timely filed.

30.      Both letters of "right to sue (conciliation failure)" were file stamped by the EEOC on October 31, 2016, and the envelopes were postmarked on the same day.

31.      The statutory period for filing suit is ninety (90) days from receipt of these letters.

32.      From the earliest possible day of receipt (Tuesday, November 1, 2016), ninety (90) days would be Monday, January 30, 2017.

**VI.     EXISTENCE OF DISABILITY**

A.      Plaintiff had—at all time relevant to this matter—a disability.

33.      For the purposes of the ADA (as amended) and this matter, the definition at 29 C.F.R. §1630.2(g)(1) applies. It states, in relevant part,

> (1) In general. *Disability* means, with respect to an individual—
>   (i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual[.]

34.      29 C.F.R. § 1630.2 (h) states, in relevant part,

> (h) *Physical . . . impairment* means—
>   (1) Any physiological disorder or condition, . . . affecting one or more body systems, such as . . . digestive[.]

35.      29 C.F.R. § 1630.2 (j) defines "substantially limits" at length, also giving rules of construction. Its many relevant provisions include the following:

> (4) *Condition, manner, or duration*—
> (i) . . . [I]n determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; . . . and/or the duration of time it takes the individual to perform the major life activity[.] . . .

36.      29 C.F.R. § 1630.2(i) defines "major life activities[,]" stating, in part,

      (i) *Major life activities*—(1) *In general.* Major life activities include, but are not limited to:
      (i) . . . sitting . . . and working; and
      (ii) The operation of a major bodily function, including functions of the . . . digestive, . . . bowel . . . functions. The operation of a major bodily function includes the operation of an individual organ within a body system.
      (2) In determining other examples of major life activities, the term "major" shall not be interpreted strictly to create a demanding standard for disability. ADAAA section 2(b)(4) (Findings and Purposes). Whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life."

37. Plaintiff's recovery from surgery required that she be allowed flexible timing—and perhaps additional time—for bathroom visits because her post-operative condition (which may persist for the rest of her life) affected the functioning of her bowel, her ability to have normal digestion, and her ability to sit and work without flexible timing for bathroom breaks.

38. In short, Plaintiff had a disability as defined at 29 C.F.R. 1630.2 for purposes of applying the ADA (as amended).

39. Plaintiff cites selected passages from the regulations here, but does not intend to indicate that they are the only relevant provisions.

## VII. FIRST CLAIM: DISCRIMINATION ON THE BASIS OF ACTUAL AND/OR PERCEIVED DISABILITY

40. On or about January 27, 2015, Plaintiff was ready, willing, and able to work.

41. Defendants refused to allow Plaintiff to return to work until her surgical staples had been removed (which would not occur until February 2, 2015).

42. Defendants were on notice that Plaintiff's physician had released her to return to work. Plaintiff was ready, willing, and able to work.

43. Plaintiff called CFA, but the usual human-resources person was not available; Plaintiff then spoke with CFA corporate office.  The person at corporate refused to allow Plaintiff to return to work until the surgical staples had been removed, saying that it would be a liability issue if they allowed her to work with the staples in place.  The person at corporate expressed concern that if Plaintiff slipped on the ice, for example, there would be a liability issue.

44. To the best of Plaintiff's knowledge and belief, non-disabled employees were not barred from coming to work because of possible icy conditions.

45. Not allowing Plaintiff to work was discrimination on the basis of a perceived disability—or, alternatively, a discriminatory response to her actual disability.

46. Plaintiff lost income and suffered other harm as a result of Defendants' unlawful conduct.

47. For example, being shut out from work for multiple days caused her to lose a crucial amount of time from an 80-hour allowance of unpaid time off.  Plaintiff ran out of unpaid time off just before a scheduled return to work—and she lost her job.

**VIII.   SECOND CLAIM:  REFUSAL TO MAKE REASONABLE ACCOMMODATION**

48. The process of post-operative recovery required Plaintiff to take more frequent bathroom breaks that a non-disabled person.  Defendants were unwilling to make reasonable accommodations for bathroom breaks.

49. An accommodation for follow-up medical appointments would not have been unduly burdensome on Defendants: although Plaintiff did not work overtime, the workplace was sometimes open for additional hours while similarly situated workers were doing overtime on the same kind of work Plaintiff did, in the same building.  Plaintiff could

have performed the same work for Defendants if she had been allowed to work a little make-up time while others around her were working overtime—if her bathroom breaks ran over the normal break time at all.

50. In telephone conversations, the human-resources officer for CFA specified that I could not return to work until I was "100%" and did not have any follow-up medical appointments. Not only is this a stricter standard than is applied to non-disabled employees, it reflected substantial resistance to making any accommodation.

51. Plaintiff lost income and suffered other harm as a result of Defendants' unlawful conduct.

IX. **THIRD CLAIM: CONSTRUCTIVE TERMINATION**

52. On Tuesday, February 17, 2015, Plaintiff's doctor wrote an Authorization for Release to Work: "Patient is able to resume work/school with no restrictions as of 2/23/15. Please excuse 2/13/15-2/22/15."

53. On or about February 17, 2015, Plaintiff informed her human-resources contact at CFA that she would be returning to work on Monday, February 23, 2015.

54. The human-resources person at CFA sent an email to Plaintiff on Thursday, February 19, 2015, suspending her from work:

> "Per our earlier conversation, I need your badge, and parking pass turned in. Once you have received Medical clearance from your Doctor we can re-visit you being brought back onto this project. I have your personal items and will give them to you when I receive the above items."

55. The same human-resources officer sent the following on Friday, February 20, 2015:

> "You have exhausted your (80) hours of unpaid time; due to your surgery. You have been out since Monday 2/09/2015 (Left early, due to not feeling well) and you stated that you are still in pain and having discomfort and may have to be up

8

>out of your seat and in the bathroom frequently, while here at work and you do not have another appointment until Monday, 2/23/2015; with no guarantees that you may not need another procedure or follow-up appointments. If that is the case you will be pointed for any time missed, which could result in your pointing out."
>
>"The time missed has affected not only your productivity, but that of the company. There are thousands of applications that need to be processed and I need you here at work. Due to your health issues you have been unavailable for approximately (3) weeks of production time.
>
>"Once you have received Medical clearance from your Doctor we can re-visit you being brought back onto this project. This means you can return with NO restrictions to work Monday-Friday, 40 hours per week, per your contract and it must cover ALL of the dates you have missed since 2/09/2015."

56. In telephone conversations with Plaintiff, CFA's human-resources person specified that Plaintiff could not return to work until she was "100%" and did not have any follow-up medical appointments. As Plaintiff's condition requires some monitoring, Defendants effectively terminated her employment.

57. A reasonable person would have understood these instructions to mean that a person who would need periodical medical appointments, or had any medical restriction (even if not relevant to the job duties), would not be permitted to work.

58. To the best of Plaintiff's knowledge and belief, such zero-tolerance were not placed on non-disabled employees.

59. The human-resources officer refers to "pointing out." Workers are allowed have seven points, which can be deducted for absences. When Plaintiff was excluded from employment with CFA, Inc., she had incurred no verbal or written disciplinary write-ups, and none of her seven points had been deducted.

60. By applying stricter health standards to the Plaintiff than to non-disabled employees, Defendants engaged in discrimination unlawful under the ADA (as amended).

61. By placing unreasonable and discriminatory prerequisites on Plaintiff's return to work, Defendants effected a constructive termination of Plaintiff's employment.

62. Plaintiff lost income and suffered other harm as a result of Defendants' unlawful conduct.

## X. RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully requests that this court enter judgment in her favor and award her the following:

1. Compensatory damages (including, but not limited to, lost wages, lost benefits, pain and suffering, and hedonic damages);

2. Such consequential/special damages as are necessary—with the compensatory damages—to make Plaintiff whole;

3. Punitive damages;

4. All costs and attorney's fees incurred as a result of bringing this action;

5. Pre-judgment and post-judgment interest on all sums recoverable, to the degree the law allows; and

6. All other relief that is warranted at law and equity.

Respectfully submitted,

s/ Jeffrey S Ankrom

Jeffrey S. Ankrom, Counsel for Plaintiff
Attorney No. 24781-53
JEFFREY S. ANKROM, ATTORNEY AT LAW, LLC
P.O. Box 672
Bloomington, IN  47402-0672
jeff@ankromlaw.com
Tel. 812-334-9010
Fax 888-254-0062

10

## DEMAND FOR JURY TRIAL

Plaintiff, by counsel, respectfully requests that issues of fact in this matter be determined by jury trial.

                Respectfully submitted,

                s/ Jeffrey S Ankrom

                Jeffrey S. Ankrom, Counsel for Plaintiff